Mark Raybould, Wake Forest University School of Law Attorney for John Hayes Under Rule 46A, I would like to introduce Raquel McGregor, a third year law student who has been certified to argue the case on behalf of Mr. Hayes. So thank you, I can introduce her. Welcome Ms. McGregor, come forward. May it please the court, my name is Raquel McGregor and I am representing the appellant John Hayes. Your honors, this is a case about a man who was wrongfully convicted. In the original double murder trial, the state presented no forensic evidence tying Mr. Hayes to the crime, the state presented no motive, and the state presented no confession or admission of guilt for Mr. Hayes who pled not guilty. Instead, the state relied entirely on the testimony of three eyewitnesses. However, since the 1994 trial, multiple pieces of new evidence from the state's own police files have come to light, and these pieces of evidence reveal significant inconsistencies in each of the eyewitnesses' testimony. The issue is therefore whether Mr. Hayes has established a claim of actual innocence to of all the new evidence disclosed nearly two decades after trial, including number one, two shell casings found on the front porch which directly contradict the state's narrative of the shooting, number two, multiple pieces of impeachment evidence which call into question the credibility of the state's key witnesses. Do we know that the shell casings came from the porch? I mean, isn't that part of it? Part of the problem, as I recall, is that there doesn't seem to be any dispute that there was more than one shooter, and when the shell casings were recovered, they were recovered by someone who said they came from the porch who is no longer available. Yes, Your Honor. The shell casings came from Mr. John Hamm who identified the shell casings while the state was still in the process of collecting, the police were still in the process of collecting the evidence, and there were other shooters acknowledged. The question, of course, is, that, of course, goes to reliability. Yes, Your Honor, but it's important to know also that Ms. Coleman, the third witness by the state, also originally said in three different instances in police reports that the shooter originally fired initial shots from the front porch. So it's not just John Hamm who said that he found the shell casings on the front porch, but we also have Ms. Coleman corroborating the location of the shell casings. The observations are, I'm not quite sure how that answers my question about reliability and your argument about the inconsistency that that necessarily injects given the fact that there was more than one shooter, and given trajectories, there were more than one possible location of the casings. Yes, Your Honor. The shell casings specifically, the FBI lab report revealed that the shell casings were So we know that it wasn't shot by a different shooter. It was fired by the same gun, and that's really important in the shell casings. Right. But you are still assuming that they were fired. The assumption is still the location where they were found. Your Honor, even if the shell casings were actually not on the front porch, which we believe they were based on what is in the record, if they were not in the same location as the other 12 shell casings, they would still contradict the story painted by the Jeter Cousins, because they would have to have been found somewhere else, in which case the shooter was somewhere else, which isn't consistent with the Jeter Cousins testimony. Aren't we talking about a really small area? I mean, the pictures that somebody helpfully provided here, you know, the shooter is shooting in a direction in which an automatic weapon would kick up and to the right. The shell casings that are found are found on the front, you know, just outside the steps of the porch, depending on the direction and manner in which he's shooting. Why do we necessarily assume that even if they were found on the porch, accepting, you know, the concerns that Judge Duncan identified, how do we assume at this point that they could not have been fired while he was standing in the vicinity where he was the first time? We know he fired quite a number of times. We don't know for certain that he never moved his feet or changed the angle of the gun such that the shell casings would be found somewhere else. Would we? Your Honor, there's accumulation of the 12 shell casings are all in and around the street and the sidewalk. They're all there. And then we have from the police diagrams, we see that's actually scaled. And it shows that there's about 5 feet, and the distance of the sidewalk is 5 feet. And then we can extrapolate from that based on the scale diagram that there's another 5 feet to the base of the steps, and then you have 3 steps to the front porch. So we know there's a minimum of about 12 feet between the locations of the other shell casings and the front porch. But that assumes that he's stationary and shooting. I understand you say he's on the porch, but your assumption there is that all 12 casings are fired from the same location at the same angle of the gun, right? I mean, changing the angle of the gun changes the trajectory of the shell casings, and they bounce all over the place, right? I mean, if you shot a semi-automatic, the shell casings don't end up in a little bucket off to the side, right? They go all over depending on where you're shooting. This is a scenario where you could reasonably assume that he's shooting in various locations in various places, no? The Jeter testimony specifically says that he was standing right behind the blue vehicle and he was shooting from behind that area. And if you see in the Joint Appendix 5, you see that there's color photographs. It doesn't say exclusively, does it? It says that's what we saw. We saw him shooting from this area. That doesn't mean that his feet are planted and he's not moving. It's not like a scenario where he's shooting out of a window of a parked car where we know that he's not moving around at all, right? Your Honor, if he went to the front porch or moved around significantly, that would be inconsistent with the Jeter cousin's testimony, which formed the entire basis of the case. And when we're looking at reasonable doubt, that is important. Well, we're not looking at reasonable doubt. I mean, the standard here, it's a demanding, actual innocence is a demanding standard, and it usually involves more than introducing inconsistencies. Here, in addition to the shell casings, which is, help me with what else you're pointing to and relying on. Right. In addition to the shell casings, we have multiple items of impeachment evidence which call into question the credibility of the State's key witnesses. For example, in both Jeter cousins' interviews originally to the police, they said that the shooter fired a dark in color, large caliber semi-automatic handgun. And then later at trial, the Jeter cousins couldn't remember anything about the gun, and they said they didn't know the difference between a pistol and a handgun. So there's a great inconsistency between what they originally said to the police report and then their sudden lack of knowledge about anything like that. But they said it had clips, right? They may not understand exactly the distinction, but someone with minimal knowledge, like a law enforcement officer, they say, I don't know the difference between a revolver and a semi-automatic, but they kept shoving clips in it. You don't have to use the word semi-automatic to translate your shoving clips into the butt of the gun to realize this is semi-automatic, right? Yes, Your Honor. I just think it's significant here that they were so specific about the type of gun and color, and then all of a sudden they didn't know a difference between, just a basic difference between a revolver and automatic weapon, which suggests that they didn't, that the story is different, and that calls into question their credibility. And that also mirrors the Finch v. McCoy case decided last week by this court, which also, the court said, if the shooter, if the key witnesses have trouble identifying the specific murder weapon, then a reasonable juror would think that they couldn't identify the shooter. A little difference talking about a shotgun and a pistol, right? I mean, here they're saying large caliber. At some point you take issue with whether a 9mm is large caliber or not. I suspect that's not your primary sort of point about the argument, distinguishing between a .22, a .9, and a .45. I don't anticipate that you're suggesting that they were lying in some way because they couldn't make that distinction based on sound. But it seems to me here that that argument that they didn't distinguish between clips going in the gun and a revolver, they may not use the terms, but they understand the ideas. Your Honor, there are just several different inconsistencies, and we want to look at that holistically under the actual innocence standard. We're looking at all pieces of evidence, not just an item-by-item analysis. So we have to consider this in conjunction with the shell casings. There's also another piece that's inconsistent about the Jeter cousin's testimony, is one Jeter cousin originally said that she had never worked at the drink house, but in fact she had told the police that she did work there. So what do you mean by that? Tell me what a reasonable jury would take by that. She doesn't want to admit to engaging in illegal activity, working in an unlawful establishment. Why does that significantly undermine her credibility? Your Honor, because if she was willing to lie about that, then a reasonable jury might think that she'd be willing to lie about the identity of the shooter. Well, I think the question suggests the distinction. She doesn't want to acknowledge engaging, working at an illegal establishment. That's a self-protective mechanism that does not seem to be implicated. It does not seem a necessary inference from the fact that she didn't want to acknowledge drinking in an illegal establishment, then one would not infer from that a willingness to inaccurately implicate a shooter. There would be no self-protective feature in the latter case. A distinction between the two types of, between the Jeter-Cousins inconsistency there, but it's just in combination with all the other... The problem I have here is this is usually when I've seen actual innocence claims, they tend to be, there tends to be sort of direct evidence pointing away from the defendant. And we don't, here we have pieces that go in different directions. The shell casings we don't know the etiology of, we don't know where they came from. Pieces of testimony that don't necessarily fit together but don't go to the core identification. This is a little, this is a little spongier than I'm used to. So I'm asking you to help me put it together into a reliable construct. Yes, Your Honor. Also we have the ten other eyewitnesses that pointed to different shooters. We know there were different shooters. We know there were, there was more than one shooter. Right, but... But that wasn't in the trial, right? It was, it stayed headed and didn't, that's the whole point. I mean, this is Mike Greger. I mean, he started with the sales cases and those things, but isn't based on the evidence, even if Coleman and the Jeters, how you pronounce it, Jeter, two Jeters, even if what they say is true, the question is who murdered someone, right? Because we, right? What is the evidence that you have about that people specifically saw people shoot other victims? That's the point. That's the question. Talk about that. That's what Judge Duncan is asking, give him a context that would attack guilty of murder. Yes, Your Honor. It's important to note none of these pieces of information were available at the original trial and significantly the Jeter cousins didn't specifically see Hayes shooting the actual victims versus one of the ten witnesses, Avalon Fryer, did see specifically saying that Sunshine and Demo were shooting specifically Samuels in the back of the head and that was corroborated by the medical testimony that said that he was actually shot in the back of the head. Can you tell me when you had access to this information? That information came out in around, between 2011 and 2013. Post trial? Yes. They didn't have it for over 20 years. But the state had it all along, correct? Yes, Your Honor. And how long before you filed the habeas? The habeas petition was filed in 2013. You rely there on Fryer and that is the best evidence you've got that somebody else did it. But don't we also know that Fryer failed a polygraph and admitted to lying about even being at the drink house that night? Actually, Your Honor, Avalon Fryer never actually took the polygraph. She didn't actually fail it. She didn't show up. And she did ultimately recant her testimony, but she also said in her statement that other people, she was scared of people on the street. So had the defense counsel had access to that information, they could have found out if she was threatened. But could have been enough here, right? I mean, the problem with Fryer, I mean, I get you. Like Fryer, if you have another eyewitness who says that that other guy did it, now we're starting to talk, I think, closer to Judge Duncan's point, that person for you is Fryer. But Fryer withdraws. I mean, we can't say that testimony is reliable because she says, actually, I wasn't there. I was home in bed. I was not at the drink house at the time this even happened. She denies any knowledge. She doesn't recant what she said. She denies even being there, right? Your Honor, the fact that she may have been threatened and that's the reason she recanted it. You kind of have to stay with the court. This is a very demanding standard, so it helps to sort of come to terms with it. This is get me past what reliable, it has to be reliable. Your Honor, given it's 25 years after the original trial, there are limited ability to get past that. So given what we have to work with, this is the most reliable evidence. It was contemporaneous to the shooting. It's much more reliable than witnesses coming 25 years later talking about what happened originally. So given what we have to work with, this is evidence in the state's own police file, the state used to build their case. It's fairly reliable as to what we can have at this point. And if I could just conclude. The fire is not the only witness. There are other witnesses. That's not the only one. It's a repeat of people who talk about people being shot and motives, correct? And having beefs with people. Yes, Your Honor. One of the witnesses talks about wanting to get his money back. So there are nine other witnesses in addition to Avalon Fire who pointed different shooters, and none of this came out in the original trial. I'm sorry, if I could just wrap up. I'm asking you a question. You don't have to wrap up yet. Just answer my question. The point, though, is you have a case where the all-states witness said that the man was in the drink house. Shooting had already started, correct? So there's no motive. It's not a question of did he shoot. The question is did he murder someone. And those other witnesses who talked about people having motives against the people who were killed, they were shooting, and the state withheld all of that. Yes, Your Honor. There was no motive demonstrated here at trial. There are ten total witnesses, including one witness who was actually shot in the back of the foot, and the state never brought an indictment for anyone against that witness, Kenneth Evans. So why didn't the state bring that up at trial? This is another witness. And we have, again, those eight other witnesses in addition to these two that point to different shooters. Had a reasonable jury, had this information, no reasonable juror would have convicted Mr. Hayes beyond a reasonable doubt, and that is the standard under the actual instance. And the precedent is Finch, right? Yes, Finch v. McCoy. Authored Finch. You talk about an exacting standard. That was a person who was there supposedly in the store when it happened. You look at it in terms of lineup and all of those things impacted whether a reasonable juror. So it's not as exacting the gateway claim. Yes, Your Honor. Finch v. McCoy is extremely analogous here because there is no DNA evidence there. There was just eyewitness testimony. There was no physical evidence. There are a lot of parallels between Finch v. McCoy here. This case is stronger than Finch. I agree, Your Honor. So when considering all the evidence holistically, it is more likely than not that no reasonable juror would have found Mr. Hayes guilty beyond a reasonable doubt. We respectfully request that this Court allow Mr. Hayes to proceed on the merits of his habeas petition. Thank you. Thank you. Mr. Breglaski. Please, the Court. My name is Peter Breglaski. I'm an Assistant Attorney General from the state of North Carolina, and I'm here on behalf of the respondents. Judge Gregory, speaking to your inquiry about the statements from other witnesses, none of those other witnesses identified shooters shooting at a particular place, in a particular direction, at a particular victim. The sum total of all that testimony was very simple, that there were other shooters out there. But the jury knew that. The jury knew that because Ms. Coleman testified that the shootings, and as did Ms. Jeter, that the shootings started before Mr. Hayes left the drink house. So we know there was shooting before. Then he went out, and according to the two Jeters, they saw him go to the trunk of a blue car and retrieve a gun. He shot in the direction where the two victims fell. So we know there was shooting then. Ms. Coleman also testified that someone was shooting about a block away from the east, so we know there was another shooter there. We also know that there was shooting after Mr. Hayes got in his car and left the scene, and I believe there was testimony. Why did the state withhold those statements? Pardon me? Why did the state not turn those over? I don't know why the state withheld those statements. That was wrong, wasn't it? You have a case where a person, 50 shots fired, 40 to 50 shots fired, and you have witnesses who talked about there were people there shooting who had direct animus against some of the people, one of the two people who were killed, right? And that's not relevant to a juror looking at whether or not – because here you're right, there's so many people shooting, the question is not whether someone shot. The question is who killed those two people. The other thing you need to look at. Do you agree with that? Pardon me? Do you agree with that? The question is who killed those two people? Absolutely, yes. And you don't think it's relevant that there are other people who said there were people in the crowd shooting and who had direct animus against the people who were shot? You don't think that's relevant? Even if that was true. I'm asking you, do you think that's relevant and appropriate? I believe that it's relevant, yes. And for a prosecution who should be interested in justice and not just a conviction, you don't think that's relevant to disclose that to the defense? I do believe it's relevant evidence. But the problem, as the court has pointed out, is this is a much more rigorous standard than whether or not at this point they can point to something that might show that there was a reasonable doubt at the time of the original conviction. What do you believe the standard is for a gateway claim to overcome the untabbed? Whether there's new, reliable evidence that undermines the confidence. And don't you think that undermines the confidence? May I finish the question? My apologies. Don't you think it undermines the confidence when you have the person who shot, that there's no known motive for him to shoot anyone, and then you have evidence that other people who were shooting who had direct animus against the people who were killed? You don't think that's directly related to whether or not a juror may have a doubt as to whether this person who was shooting killed the person? Because your evidence was the person first shot in the air. That's correct. Right, in the air. And then they swaggered the thing and then shot. But you have evidence that you didn't turn over, that there were people in the crowd who were shooting, one, and had direct animus, two, against people, three, who wound up dead. And that's not relevant in terms of whether a juror would believe a reasonable doubt whether this person killed that person? That turns a breeze on top of his head to say that. But that evidence is not reliable. Why is it not reliable? Just as reliable as yours. If you had two people go into a drink house and they tell you something, they had a different thing, that's reliable. But the other people who were there who saw that, they're not reliable? How is that? One measure of reliability today is that the witnesses that testified on behalf of the state took an oath. These witnesses did not. Because they didn't get a chance because you did not disclose them. You can't vulture somebody up because you put them in a position to be able to testify. You withhold the others and say, guess what, we testified. But Schlupp made it clear that this is not a glorified reasonable doubt standard. This is a different standard. At the time, we do know that there were a lot of shots fired because they continued to be fired even after the police arrived. So it is clear that there were a number of shots fired. And the jeeters, I don't understand why they're spelled differently for the same name, but the jeeters testified that they watched Hayes stand behind the blue car, open the trunk, take out a semi-automatic, and fire multiple times in the direction of the crowd hitting, bidding, and salmon. So that's what they did. But they didn't testify that they hit anybody, did they? I'm sorry? There was no testimony they saw anyone hit by those cars, did there? My belief is the testimony was hit by them. That they hit them? No, that they fired in the direction. Into the crowd. Oh, yeah. In the direction. Yes. And I'm sorry, I did not mean to make it sound. They fired into a crowd. Yes. And that is when, let me restate that because that was not clear. That's when bidding and Samuels were hit. Yes, ma'am. And so did Coleman. And you have the shell casings. You don't have any forensic evidence here at all. Other than the weight of the bullet. Other than the medium. Yes, that's true. And you have the, what you have now is some, you have inconsistent statements on the part of the two Jeters. And you have the casing, the casings that may or may not have been found on the porch. That's correct. And that's, I mean, that's. And see, this is part of the problem with the case. Are you going to put the new evidence into that? I'm sorry, sir? Are you going to put the new evidence into that calculus? Because that's what you're supposed to do under the law. That's correct. But it's not reliable evidence. The new evidence, yeah. As a matter of fact. How is it not reliable? Again, it wasn't under oath. And this is never under oath. When they come up to you and say, I saw someone kill somebody. And then that's their statement. And then you withhold that. And now you say it's not reliable because it wasn't under oath? That would be absurd. That would mean the prosecution could say, wait a minute. I'm not saying this case, but hypothetically. Anything that's said to me by a witness is inconsistent with my theory of the case. I'm not going to do anything further. You never get under oath. And then if it ever comes back later that you existed, well, you're not reliable because you weren't under oath. That's absurd. Isn't that the distinction between the two steps of this process? That the first question, we look at the evidence as we've got it, for better or worse, and we determine the actual innocence standard. The second question, which I understand you are not disputing here, or at least is not at issue, is the question of disclosure or nondisclosure. You can't import the second question about a failure to disclose into the first question, which is an analysis simply of the new reliable evidence. You've got to look at the evidence as it is, right, not importing some challenge based on the constitutional violation that's the claim that you only get to if you pass this threshold standard, right? Well, the problem with the case – oh, I'm sorry. No, no, because the difference is, is had they filed this in a timely manner, then we would be looking at the claim under Brady or Giglio or now of whether that evidence infected the trial. That would be what happened if they did it in a timely manner. We're looking at the question through the lens of a petitioner who failed to file on time and can only be excused if we take the evidence as it stands as satisfying the standard. That's correct, and part of the problem, Judge Gregory, is that the actual innocence standard, as the courts have pointed out repeatedly, is heftier than the prejudice standard that one would need to show for Brady. Did you read Finch? Yes, sir, I did. And did Finch raise a question about identification, line of identification? Yes, it did. And that was a part of the reason because it violated in terms of unfair alignment, was it not? That's true. And constitutional questions did impact that, not just in terms of looking at what the facts were in terms of whether or not actual innocence, but the way that infected the whole idea of the jury because the identification was based on a three-quarter length code being used on the same person each time and just changed in the order. Those are constitutional questions that impacted. And also, two, what impact was on the witness that testified that he saw the person at the service station before it happened? You talk about his being pressured by the sheriff. All of those things came into account. You have to read Finch very carefully, and that's the precedent. This panel can't overturn Finch. I'm not asking you to overturn Finch, but what I would suggest to you is look at the caliber of the evidence that was presented in support of Finch's claim and compare that with the caliber of the evidence that they're relying on here. That's the issue that you need to look at. The court, the Schlepp court, identified three types of evidence, and I think they were very careful in choosing this evidence because this evidence tends to be very compelling in and of itself. Exculpatory scientific evidence, trustworthy eyewitness accounts, and critical physical evidence. And all three of those elements were present in Finch, and none of those elements are present in this case. And that's the problem, and that's why I don't believe that they've met their burden to show actual innocence by new, reliable evidence. Do we look at the weakness of the case that you had? Excuse me? Is the weakness of North Carolina's case part of it, too? As far as the standard that's been articulated by the Supreme Court, I don't think they did so. For example, when I asked the question, when the witness said they saw him shoot, they didn't see anybody. You said that's when he was shot, hit. They didn't say that. I didn't say that. I know that right. There's no evidence of when they were killed in terms of we know. Just doing that total incident, they died. But there's no one that says he shot and then I saw someone fall or saw someone hit. Is that correct? That's correct. And is the jury entitled to give equal weight to circumstantial and direct evidence? Yes. And so that's that question, right? It's like whether it's direct evidence, I saw the person fall, or circumstantial evidence, he fired in this direction, two people found in that direction. That's correct. What's the third slot? Remind me again. Physical evidence. We don't have exculpatory scientific evidence. No, ma'am. We don't currently, any more than we did before, have trustworthy eyewitness accounts. Yes, those are all speculative. And the part that I find the most trustworthy here is that the piece of physical evidence we have is inherently unreliable because we have no idea where it came from. And the person who turned it in is not available to follow up with at all. So whatever may have happened or not happened, originally what we have now is none of the three categories of evidence that Schlupp directs us to. That's correct. I believe that to be the case, and that's why I don't think they've made their case. And if you go back to your original questions to counsel, when counsel got up here, most of those questions were based on what they've got, and they had a speculation. To your question, Judge Duncan, where was the shell casing found? Is there anything that shows where it was found? Is there anything that shows when it was found? Do we know what the relationship with Mr. Hamm was to this scene? Do we know whether Mr. Hamm had any relationship to any of the participants? And, see, this is part of the problem. As Your Honor pointed out, the evidence in these actual innocence cases tends to be much stronger. And it has to be stronger by definition because that's what the Supreme Court has commanded in House and Schlupp. And, unfortunately, that's not what the defendant has here. And so I don't believe that the defendant has made his claim of actual innocence. And, Judge Gregory, to go back to your question about the shooting, yes, there were other people who indicated that they saw other shooters, but if you look at the physical evidence that was collected, none of that lined up with what those people said. And a prime example of this is Mr. Evans. He's the gentleman who was shot in the ankle. His statement to the police originally was that he was on the drink house porch and there was a person across the way by a white car shooting. I believe he said in the air. When he actually testified at the NAR hearing, he didn't testify about a man across the street by the white car. He testified he didn't know who started the shooting, but when the shooting started, he ran. He was about a block away and he turned to the right, which would have been to the south, to run between what he describes as a cut. I'm just assuming that means a little pathway between the houses. And that's when he was shot in the ankle, the outer left ankle, which would indicate that the shooting was coming from the east toward the west. And according to the state's evidence, Mr. Hayes was standing to the west shooting toward the east. So clearly he wasn't shot by Mr. Hayes. And there was evidence that they recovered two .32 caliber casings near to where Mr. Hayes was shot. So it's very clear that there was more than one shooter. But the critical part here is look at what happens when Mr. Evans now testifies under oath. His story changes and his story changes in a very dramatic fashion and it's no longer helpful to the defendant. And so I would point out again that Mr. Evans' original statement was not reliable because once there was an oath, the story changed. Because as the court well recognizes, oaths have import, which is why the courts use them. And sometimes people will say one thing to the police, but when push comes to shove and they've got to take an oath, the testimony changes. So part of what they have here is a lot of speculation, which I don't believe rises to the level of actual innocence. The thing that makes this case troubling is less its current status than the fact that the caliber of evidence at trial was questionable. There was no physical evidence the first time. There was no scientific evidence the first time. So you're overlaying, where am I going with this? I'm not sure. I understand your frustration because this is a frustrating thing to try to sort out. It's hard to put it all together because you didn't have a strong, you didn't have a rock-solid case to start with, but to go back and try to reconstruct it is challenging too because the responses are subject to a very different standard. Yes, ma'am. Are there any other questions from the panel? Nothing. Thank you kindly. Thank you, counsel. Ms. McGregor? Ms. McGregor, we've had some pretty high-profile actual innocence claims in North Carolina, and this one is interesting to me because some of the things it doesn't have. It doesn't have the continued assertions of innocence that we saw with some of the cases that have come out. I'm very familiar with the good work that's being done by the law schools and the innocence clinics.  Hayes did not file a petition for discretionary review with the North Carolina Supreme Court. That's just before your involvement. Yes, Your Honor. I don't know the specifics about that, but specifically we'd like to emphasize that a petitioner's silence can't be used against him. Oh, absolutely. I mean, first of all, we're not in that context, but second of all, I'm just looking at actual innocence claims that we have seen because that's one of the things we've been doing is to try to line up the evidence of support, the quality of the evidence that we're looking at now. Yes, Your Honor. I think this case is very similar to Finch v. McCoy, as I mentioned earlier, because, again, there was no physical evidence tying the petitioner there. The physical evidence here seems to me at best problematic. Your Honor, there's no forensic evidence. There's no gun recovered. There's no motive. Right, and I was just referring to the casings. I'm sorry. Oh, yes, Your Honor. But, again, we're looking at a holistic standard. We're looking not just at the shell casings. We're looking at that in combination with the other pieces of evidence. We're looking at the inconsistencies with the Jeter's testimony about the handgun, also about the Jeter not working at the drink house, and then we're looking at that in combination with the ten witnesses, and also Ms. Coleman originally said to the police report that the shooter was 5'6", and Mr. Hayes is actually 6 feet tall, and she was the third corroborating witness who didn't actually identify Mr. Hayes, so it's likely she was pointing to a different shooter. So, again, we believe that the shell casings by themselves create reasonable doubt, but that in combination with the other pieces of evidence are such that no reasonable juror today faced with this new evidence would have found Mr. Hayes guilty beyond a reasonable doubt. I just don't see how you'd attach reliability to those shell casings if you can't show with some degree of reliability where they came from. Again, Your Honor, even if they weren't on the front porch, which we believe they were, if they weren't in that same area with the other shell casings, that means... What's the basis for your belief that they were? Somewhere else? Not on the porch. Oh, I'm just saying that we believe they were on the front porch, but even if they were not on the front porch... What was my question? I'm saying that in the alternative that they weren't on the front porch, either they were on the front porch or they were actually located somewhere else. We believe they were. But even if they were located somewhere else, that would still contradict the Jeter Cousin's testimony because they weren't located in that original 12 shell casings accumulation that was collected by the police. But that depends on trajectory and stance to the shooting. Yes, Your Honor, but given that the state did not turn over this evidence, we do not have the ability to question John Hamm now. He is deceased. But had the state turned it over, we could have questioned him. And originally that would have been admissible under multiple standards, which goes to the reliability. So it would have been admissible. I mean, we could have subpoenaed him and he could have testified on the stand under police business records of exception. And your argument is that you may have had ineffective assistance of counsel because presumably defense could have uncovered this as well. Yes, Your Honor, that is one of our three underlying constitutional claims in addition to Brady and Nippu. So, again, the reliability, we think it should not be held against the petitioner now. That's the standard. The evidence has to be reliable. That's a given. Reliability is a spectrum. And here it's as reliable as it can be, considering that we're over 25 years later. And, again, we're looking not just at the shell casings. We're looking at the inconsistencies. And, again, it's a holistic review of all the evidence. And, therefore, we think that no reasonable juror would have convicted Hayes beyond reasonable doubt. And it's also important to note that the Schlup Court emphasizes that a petitioner need not prove his innocence with absolute certainty to satisfy the actual innocence standard under Hasseby Bell. And we also see similar language in Telgesby Zook in the Fourth Circuit, which noted that the Schlup standard does, quote, not require absolute certainty of a petitioner's innocence. So, ultimately, we don't have to find 100% that he didn't do it. But beyond reasonable doubt is the fundamental core of our system. And that is the standard here, is that no reasonable juror would have convicted Mr. Hayes beyond a reasonable doubt. So there might be little pieces and holes here and there, but that is not the standard and that is not the bedrock of our legal system. The new evidence doesn't have to prove that he's innocent, but it raises a doubt. Correct, Your Honor. That is a different actual innocence standard. That's not what we are alleging. We're alleging a procedural actual innocence standard here, which does not require conclusive 100% he didn't do it. It's just no reasonable juror would have convicted beyond reasonable doubt. So, ultimately, we respectfully request that this court allow Mr. Hayes to proceed on the merits of his habeas petition. Thank you, Your Honor. Thank you so much. I note, Professor and Ms. McGregor, you're a court opponent, and we appreciate that. On behalf of the Fourth Circuit, we thank you. Couldn't do our job without your fine assistance. And also thank Mr. Regulasky for your fine representation of North Carolina. Judge Duncan has something to say. I would like to ask the court's indulgence to comment on what I think is the quality and value of the work done by the law school in this area. I think it's a service very worthy of recognition and support. Thank you for your indulgence. Well, absolutely. Wake Forest is well known for their clinic and good students, and thanks to McGregor, you and the Demon Deacons were well represented. We don't have to go back. Yesterday you brought it up, so I want to make sure. She knows that ACC team.
judges: Roger L. Gregory, Allyson K. Duncan, Julius N. Richardson